## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

DEBRA LEE BAROS,

      Plaintiff,

v.                                       CIV 20-0523 KBM

KILOLO KIJAKAZI,[1]
Commissioner of Social
Security Administration,

      Defendant.

## <u>MEMORANDUM OPINION AND ORDER</u>

THIS MATTER is before the Court on Plaintiff's Motion to Reverse and Remand for Rehearing with Supporting Memorandum (*Doc. 26*), filed on March 2, 2021. Pursuant to 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73(b), the parties have consented to me serving as the presiding judge and entering final judgment. *See Docs. 5*; *10*; *11*. Having considered the record, submissions of counsel, and the relevant law, the Court finds Plaintiff's motion is well-taken and will be granted.

### I.    Procedural History

On October 26, 2017, and November 28, 2017, respectively, Ms. Debra Lee Baros ("Plaintiff") filed applications with the Social Security Administration for a period of disability and disability insurance benefits ("DIB") under Title II of the Social Security Act ("SSA")

---

[1] Kilolo Kijakazi became Acting Commissioner of Social Security on July 9, 2021. Pursuant to Federal Rule of Civil Procedure 25(d), Kilolo Kijakazi should be substituted for Andrew Saul as the defendant in this suit. No further action need be taken to continue this suit by reason of the last sentence of section 405(g) of the Social Security Act, 42 U.S.C. § 405(g).

and for Social Security Income ("SSI") under Title XVI of the SSA. Administrative Record[2] ("AR") at 212-20. Plaintiff later withdrew her application for DIB benefits, proceeding on only her application for SSI benefits. AR at 16, 38.

Plaintiff alleged her disability began on September 1, 2012, due to low vision and loss of peripheral vision in her right eye, detached retina in the right eye with scarring, cataract surgery in the right eye, bilateral Meniere's disease,[3] and balance problems. AR at 214, 241. Disability Determination Services ("DDS") determined that Plaintiff was not disabled both initially (AR at 70-95) and on reconsideration (AR at 100-33). Plaintiff requested a hearing with an Administrative Law Judge ("ALJ") on the merits of her disability applications. AR at 158-63. Both Plaintiff and a vocational expert ("VE") testified during the *de novo* hearing. *See* AR at 34-69. Plaintiff was assisted by a non-attorney representative, Roy Archuleta. AR at 32, 35

ALJ Ann Farris issued an unfavorable decision on August 9, 2019. AR at 16-25. Plaintiff submitted a Request for Review of Hearing Decision/Order to the Appeals Council (AR at 208-11), which the Council denied on April 20, 2020 (AR at 1-7). Consequently, the ALJ's decision became the final decision of the Commissioner. *Doyal v. Barnhart*, 331 F.3d 758, 759 (10th Cir. 2003).

---

[2] Document 21-1 contains the sealed Administrative Record. *See Doc. 21-1.* The Court cites the Administrative Record's internal pagination, rather than the CM/ECF document number and page.

[3] Meniere's disease is a disorder of the inner ear, which can cause severe dizziness, tinnitus, intermittent hearing loss, and ear pressure or pain. *See Meniere's Disease*, U.S. Nat'l Library of Medicine, https://medlineplus.gov/menieresdisease.html (last visited Sept. 23, 2021).

## II.     Applicable Law and the ALJ's Findings

A claimant seeking disability benefits must establish that she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *see also* 20 C.F.R. § 416.905(a). The Commissioner must use a five-step sequential evaluation process to determine eligibility for benefits. 20 C.F.R. § 416.920(a)(4); *see also Wall v. Astrue*, 561 F.3d 1048, 1052 (10th Cir. 2009).

The claimant has the burden at the first four steps of the process to show: (1) she is not engaged in "substantial gainful activity"; (2) she has a "severe medically determinable . . . impairment . . . or a combination of impairments" that has lasted or is expected to last for at least one year; and (3) her impairment(s) meet or equal one of the listings in Appendix 1, Subpart P of 20 C.F.R. Pt. 404; or (4) pursuant to the assessment of the claimant's residual functional capacity (RFC), she is unable to perform her past relevant work. 20 C.F.R § 416.920(a)(4)(i-iv); *see also Grogan v. Barnhart*, 399 F.3d 1257, 1261 (10th Cir. 2005) (citations omitted). "RFC is a multidimensional description of the work-related abilities [a claimant] retain[s] in spite of her medical impairments." 20 C.F.R. § 404, Subpt. P, App. 1 § 12.00(B); *see also* 20 C.F.R. § 416.945(a)(1). If the claimant meets "the burden of establishing a prima facie case of disability[,] . . . the burden of proof shifts to the Commissioner at step five to show that the claimant retains sufficient . . . RFC to perform work in the national economy, given [her] age, education, and work experience." *Grogan*, 399 F.3d at 1261

(citing *Williams v. Bowen*, 844 F.2d 748, 751 & n.2 (10th Cir. 1988)); *see also* 20 C.F.R. § 416.920(a)(4)(v).

At Step One of the process, ALJ Farris found that Plaintiff "has not engaged in substantial gainful activity since October 25, 2017, the application date . . . ." AR at 18 (citing 20 C.F.R. § 416.971). At Step Two, the ALJ concluded that Plaintiff "has the following severe impairments: Meniere's disease and tunnel vision in the right eye." AR at 18 (citing 20 C.F.R. § 416.920(c)). The ALJ found Plaintiff's major depressive disorder and learning disorder in reading to be non-severe, concluding that they do "not cause more than minimal limitation in the claimant's ability to perform basic mental work activities." AR at 18.

At Step Three, the ALJ found that Plaintiff "does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 [C.F.R.] Part 404, Subpart P, Appendix 1 . . . ." AR at 20 (citing 20 C.F.R. §§ 416.920(d), 416.925, 416.926). In making this determination, ALJ Farris specifically considered Listing 2.07, Disturbance of Labyrinthine-Vestibular Function, and Listing 2.02, Loss of Visual Acuity. *See* AR at 20.

At Step Four, the ALJ found that while Plaintiff's "medically determinable impairments might be expected to cause some of the alleged symptoms[,] . . . [Plaintiff's] statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in [the ALJ's] decision." AR at 21. The ALJ considered and discussed the evidence of record as well as the opinions of consultative physician Raul Young-Rodriguez, M.D., consultative psychologist Robert Kruger, Ph.D.,

State agency medical consultants Susan Clifford, M.D. and Craig Billinghurst, M.D., and

State agency psychological consultants Kathleen Padilla, Ph.D. and Scott Walker, M.D.

AR at 22-24. Ultimately, the ALJ found that Plaintiff

> has the residual functional capacity to perform a full range of work at all
> exertional levels but with the following non-exertional limitations: she is not
> able to perform work that requires balance; she must avoid prolonged
> exposure to direct sunlight and loud work environments; she must avoid
> exposure to hazardous conditions such as unprotected heights and
> dangerous moving machinery; she is not able to perform work that requires
> depth perception or peripheral vision to the right.

AR at 20.

Given this RFC, ALJ Farris concluded that Plaintiff had no past relevant work (AR

at 24 (citing 20 C.F.R. § 416.965)) but that she was able to perform work as a dining

room attendant, hospital cleaner, and counter supply worker. AR at 24-25.

Consequently, the ALJ ultimately determined that Plaintiff had "not been under a

disability, as defined in the Social Security Act, since October 25, 2017 . . . ." AR at 25

(citing 20 C.F.R. § 416.920(g)).

## III.    Legal Standard

The Court must "review the Commissioner's decision to determine whether the

factual findings are supported by substantial evidence in the record and whether the

correct legal standards were applied." *Lax v. Astrue*, 489 F.3d 1080, 1084 (10th Cir.

2007) (quoting *Hackett v. Barnhart*, 395 F.3d 1168, 1172 (10th Cir. 2005) (internal

citation omitted)). A deficiency in either area is grounds for remand. *Keyes-Zachary v.

Astrue*, 695 F.3d 1156, 1161, 1166 (citation omitted). "Substantial evidence is 'such

relevant evidence as a reasonable mind might accept as adequate to support a

conclusion.'" *Lax*, 489 F.3d at 1084 (quoting *Hackett*, 395 F.3d at 1172). "It requires

more than a scintilla, but less than a preponderance." *Id.* (quoting *Zoltanski v. F.A.A.*, 372 F.3d 1195, 1200 (10th Cir. 2004)). The Court will "consider whether the ALJ followed the specific rules of law that must be followed in weighing particular types of evidence in disability cases, but [it] will not reweigh the evidence or substitute [its] judgment for the Commissioner's." *Id.* (quoting *Hackett*, 395 F.3d at 1172 (internal quotation marks omitted)).

"The possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's findings from being supported by substantial evidence." *Id.* (quoting *Zoltanski*, 372 F.3d at 1200). The Court "may not 'displace the agenc[y's] choice between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it de novo.'" *Id.* (quoting *Zoltanski*, 372 F.3d at 1200).

**IV.    Discussion**

Plaintiff asserts that four basic issues merit remand: (1) the ALJ erred in assessing her visual impairments; (2) that the ALJ erred in assessing her balance problems; (3) that the ALJ erred in assessing her ability to bend; and (4) the ALJ erred in evaluating Dr. Krueger's opinion. *Doc. 26* at 1-20.

**A.   Whether the ALJ erred in assessing Plaintiff's visual impairments.**

To account for Plaintiff's visual impairments, the ALJ included certain limitations in the RFC, for instance, that she "is not able to perform work that requires depth perception or peripheral vision to the right." AR at 20, 22. Additionally, the ALJ determined that Plaintiff "must avoid exposure to hazardous conditions such as unprotected heights and dangerous moving machinery." AR at 20. Plaintiff submits that

these limitations are "vague and insufficient" and, further, that ALJ Farris committed legal error by failing to adequately define the functional consequences of her vision limitations. *Doc. 26* at 7, 10 (citing *Norris v. Apfel*, No. 99-6167, 2000 WL 504882 (10th Cir. Apr. 28, 2000)). Couching her claim in terms of legal error rather than substantial evidence, Plaintiff faults the ALJ for failing to comply with Social Security Ruling 96-8p's requirement to provide specific vocationally-relevant vision limitations. *Id.* at 10 (citing *Norris*, 2000 WL 504882; SSR 96-8p, 1996 WL 374184 (July 2, 1996)). Plaintiff highlights medical records indicating that her impaired depth perception caused her to run into walls. *Id.* at 11 (citing AR at 42-43, 48, 264-65). She also references records that document her tunnel vision and inability to see clearly out of her right eye. *Id.* (citing AR at 46-47, 50, 253). Finally, she cites records noting wavy, blurry, double, and distorted vision in both eyes. *Id.* (citing AR at 354, 483, 487, 491, 565, 611, 613).

The ALJ discussed medical evidence related to Plaintiff's vision impairments, acknowledging that treatment notes demonstrated a "history of vision impairment in her right eye." AR at 21. The ALJ noted Dr. Young-Rodriguez's March 10, 2018 finding that Plaintiff's visual acuity was "20/100 in her right eye and 20/25 in the left eye with glasses." *See* AR at 22 (citing AR at 594-96). But she also observed that Plaintiff's vision examinations in the months following – in April, May, and June of 2018 – revealed right eye acuity of 20/80 with correction and left eye acuity of 20/20. AR at 21-22 (citing AR at 561-63, 679-86).

The ALJ found Plaintiff's subjective complaints about her vision, including her allegation of 75 percent right eye blindness, to be overstated. AR at 25. She noted that Plaintiff could prepare simple meals, perform household chores, manage her finances,

and drive. *See* AR at 41-42. She also explained that Plaintiff's treatment notes confirmed "some complaints of vision related to her right eye and her right eye visual acuity was 20/80 during examinations; however, her right eye was 20/20 after she underwent cataract surgery." AR at 24 (citing AR at 561-63, 611, 679-86). Although the ALJ stated that Plaintiff's *right* eye acuity was 20/20 post-cataract surgery, it appears from the records cited and from Plaintiff's medical history that the ALJ intended to state that Plaintiff's *left* eye was 20/20 post-cataract surgery. *See, e.g.*, AR at 561-63 (indicating that Plaintiff's left visual acuity was 20/50 *before* cataract surgery in December 2017), 679-686 (indicating that in April, May, and June 2018, Plaintiff's left visual acuity was 20/20). Importantly, Plaintiff's right eye cataract surgery was performed more than a decade before her SSI application and protective filing date, and the records do not support right eye acuity of 20/20 following that 2004 surgery. *See* AR at 679 (documenting Plaintiff's "Past Ocular History" and noting cataract surgery in the right eye (OD) in 2004 and in the left eye (OS) in 2017); 679-686 (indicating that Plaintiff's right visual acuity was 20/**80** in April, May, and June 2018). Despite the ALJ's apparent misstatement as to Plaintiff's right eye acuity, the Court can follow her rationale. Helpfully, she stated elsewhere in her decision that she limited Plaintiff "to work with no requirement to use depth perception or peripheral vision on the right *due to her diminished visual acuity on the right*." AR at 22 (citing AR at 561-63, 679-86) (emphasis added).

The question remains, however, whether the ALJ properly considered Plaintiff's ability to perform work-related functions in light of her vision limitations such that she complied with the dictates of SSR 96-8p. Pursuant to this Ruling, an ALJ must "consider

the individual's residual capacity to perform such work-related functions as working with large or small objects, following instructions, or avoiding hazards in the workplace." SSR 96-8p, 1996 WL 374184; *see also* 20 C.F.R. § 404.1545(d) (recognizing that "impairment(s) of vision . . . , may cause limitations and restrictions which affect other work-related abilities"). Although ALJ Farris determined that Plaintiff must avoid certain hazards, such as unprotected heights and dangerous moving machinery, Plaintiff insists that she failed to assess her ability to "recognize and avoid **ordinary** workplace hazards." *Doc. 26* at 11. In other words, Plaintiff faults the ALJ for neglecting to assess her ability to navigate an ordinary workplace. *Id*. Plaintiff cites *Norris* in support of this position. *Id*. at 10-11.

The claimant in *Norris* asserted that corneal implants in both of his eyes limited his ability to work around machines, to lift heavy items, to perform outdoor work, and to read small print. *Norris*, 2000 WL 504882, at *1. Overall, Norris's visual impairments were more severe than those of Plaintiff. *Id*. at *1-2. His best corrected vision in his left eye was 20/50, and his left pupil was irregular and nonreactive. *Id*. at *2. He also experienced "extreme lack of acuity" in his right eye, with his best corrected vision worse than 20/200. *Id*. at *3. Additionally, Norris suffered strabismus, a condition potentially resulting in vision loss or double vision. *Id*.

Despite these vision impairments, the ALJ in *Norris* merely found that the claimant had "limited vision, especially in his right eye." *Id*. at *2. The Tenth Circuit described this finding as "conclusory and insufficient," explaining that "the potential ramifications" of Norris's vision impairments were "significant." *Id*. at *2-3. The court reasoned that Norris's severe lack of acuity and strabismus "surely impair[ed his] depth

perception as well as the peripheral vision in his right eye, and therefore reasonably could affect his ability to walk and carry things safely in the workplace." *Id*. at *3. Yet, the court emphasized that the ALJ addressed neither depth perception nor peripheral vision. *Id*.

As Plaintiff points out, the Tenth Circuit in *Norris* cited SSR 96-8p for the proposition that an adjudicator "assessing [the] RFC for an individual with a visual impairment . . . must consider the individual's residual capacity to perform such work-related functions as working with large or small objects, following instructions, or avoiding ordinary hazards in the workplace." *Id*. at *2 (quoting SSR 96-8p, 1996 WL 374184, at *6). Ultimately, the Tenth Circuit in *Norris* determined that the ALJ failed to adequately address the impact of Norris's vision impairments on his ability to perform work functions, such as "navigating safely at work." *Id*. at *3. This finding is not surprising, given that the ALJ failed to identify *any* work-related functions impacted by Norris's severe visual impairments and poor visual acuity.

But ALJ Farris' vision limitations were more detailed than those at issue in *Norris*. The ALJ here found that Plaintiff was limited to jobs that did not require depth perception or peripheral vision on the right. AR at 20. She also touched upon Plaintiff's ability to work around hazards, determining that he must avoid unprotected heights and dangerous moving machinery. AR at 20. While Plaintiff asserts that "[t]he ALJ omitted other work-related functional limitations SSR 96-8p required her to consider," the Court is satisfied that the ALJ's analysis and findings are consistent with SSR 96-8p. Indeed, the RFC assessment reveals that the ALJ considered Plaintiff's ability to navigate hazards, given her limited peripheral vision and depth perception, but that Plaintiff's left

eye visual acuity of 20/20 led her to conclude that further work-related functions were not significantly impacted. In short, although the ALJ did not directly discuss SSR 96-8p's instructions concerning vocationally-relevant vision limitations, the Court is satisfied that she adequately complied with the requirements therein.

Plaintiff asserts a second argument related to her vision impairments – that despite finding the opinions of non-examining state agency physicians Drs. Clifford and Billnghurst persuasive, the ALJ failed to include their opined limitations for near and far acuity in the RFC. *Doc. 26* at 11-12. The ALJ discussed the vision-related findings of Drs. Susan Clifford and Craig Bullinghurst, which she summarized as follows: "limited right field of vision and near/far acuity." AR at 22 (citing AR at 78-80, 91-93, 112-14, 129-31). Technically, Dr. Clifford found limited near and far acuity in *both* of Plaintiff's eyes, while Dr. Billinghurst found limited near and far acuity in Plaintiff's *right* eye. *Compare* AR at 78-93, *with* AR at 129-41. Without making any distinction in these acuity findings or noting whether the limitations applied to one or both eyes, the ALJ explained that she found the opinions "persuasive because they are supported by [the physicians'] review and summary of the medical evidence available at the time of the opinions." AR at 22.

The ALJ's finding that *both* acuity opinions, despite their differences, were supported by the medical evidence can be reconciled by examining the acuity measurements available at the time the physicians rendered their respective opinions. The ALJ cited records indicating that in November 2017, before Plaintiff's left-eye cataract surgery, her left eye acuity was 20/50. AR at 22-24 (citing AR at 561-63). But the ALJ also cited records revealing that four months after that cataract surgery

Plaintiff's left eye acuity had improved to 20/20. AR at 22 (citing AR at 679-86, 708-10, 748-52). Notably, Dr. Clifford found limited near and far acuity in both eyes before the records indicated that Plaintiff's left eye acuity had improved to 20/20. *Compare* AR at 78-80 (4/12/2018 Clifford opinion finding limited acuity in *both* eyes), *with* AR at 685-86 (4/18/2018 record documenting left eye acuity of 20/20), 682-83 (5/15/2018 record documenting same), 679-80 (6/15/2018 record documenting same). The ALJ herself observed that Plaintiff's left eye acuity improved to 20/20 in the months following his late-2017 cataract surgery. AR at 24 (citing 561-63, 611, 679-86). Thus, the different visual examination records available to Drs. Clifford and Billinghurst account for their different acuity findings. Further, the ALJ's finding that the physicians' opinions are supported by "medical evidence available at the time of the opinions" is supported.

Yet, the ALJ fails to explain why she did not include in the RFC explicit limitations in the areas of near and far acuity. The Commissioner concedes that the ALJ did not recite verbatim the vision-related limitations found by Drs. Clifford and BIllinghurst. *Doc. 30* at 19. Instead, the ALJ reasoned that a limitation to work not requiring depth perception or right-side peripheral vision was "generally consistent" with the opinions of Drs. Clifford and Billinghurst. AR at 24 (citing AR at 78-80, 91-93, 129-31, 112-14, 594-96). *But see Romero v. Saul*, No. 20-256 JFR, 2021 WL 1873468, *11 (D.N.M. May 10, 2021) (concluding that where the RFC included limitations in the claimant's peripheral vision on the left as well as his depth perception, the ALJ failed to adequately address the extent of visual limitations caused by limited acuity).

Regardless, the Commissioner insists that any error in omitting a limitation to account for Plaintiff's impaired visual acuity was harmless. *Doc. 30* at 19 (citing *Shinseki*

*v. Sanders*, 556 U.S. 396, 409 (2009) for the proposition that it is the burden of the party attacking the agency's determination to show that an error is harmful). As noted by the Commissioner, two of the three jobs identified by the ALJ did *not* require near or far acuity. *Id*. More specifically, Dictionary of Occupational Titles ("DOT") entries for hospital cleaner and counter supply worker provide that near acuity and far acuity are "condition[s that do] not exist" for those jobs. *See* DOT No. 323.687-010, Cleaner, hospital, 1991 WL 672782 (Jan. 1, 2016); DOT No. 319.687-010, Counter-supply worker, 1991 WL 672772 (Jan. 1, 2016). While the dining room attendant job requires *occasional* far acuity (DOT No. 311.677-018, Dining room attendant, 1991 WL 672696 (Jan. 1, 2016)), the other two jobs identified together encompass 165,000 national positions. *See* AR at 66. As such, any error related to the ALJ's failure to include a near or far acuity limitation was harmless. *See Drake v. Berryhill*, No. CIV 17-1135 KBM, 2019 WL 461296 (D.N.M. Feb. 6, 2019) (reasoning that 70,000 jobs rose to the level of "significant numbers" as required by 42 U.S.C. § 423(d)(2)(A)). The Court will not reverse on this ground.

**B.  Whether the ALJ erred in assessing Plaintiff's balance problems.**

Dr. Young-Rodriguez performed a consultative evaluation of Plaintiff in March of 2018. AR at 594. The ALJ discussed Dr. Young-Rodriguez's findings, including those relevant to Plaintiff's purported balance problems. AR at 22. For instance, the ALJ noted that Dr. Young-Rodriguez's "examination showed [Plaintiff] was able to ambulate without difficulty, get on/off the examination table and get up from a chair[,] but she needed to hold herself still for a moment to regain her balance and fell backwards during Romberg testing." AR at 22 (citing AR at 594). The ALJ also noted Dr. Young-

Rodriguez's observation that Plaintiff "had good range of motion in her upper and lower extremities[,] but she needed to hold onto furniture during testing because of dizziness." AR at 22 (citing AR at 594). Further, the ALJ acknowledged that Dr. Young-Rodriguez found Plaintiff able to walk a few steps on heels and toes and to squat but not to walk heel to toe. AR at 22 (citing AR at 594). In addition, review of Dr. Young-Rodriguez's opinion also reveals that Plaintiff reported being able to walk on the level ground for one mile, to go up and down a flight of stairs with a handrail, and to sweep, mop, cook, and wash dishes. AR at 595.

The ALJ recited Dr. Young-Rodriguez's finding that Plaintiff "should avoid activities requiring excellent balance during an exacerbation of her Meniere's disease." AR at 22 (citing AR at 594). Explaining that she found this opinion consistent with the record, the ALJ characterized it as "persuasive." AR at 22. Moreover, she explained that Dr. Young-Rodriguez's findings, which showed problems with balance while performing a range of motion testing, led her to limit Plaintiff to "work that did not require balancing." AR at 23 (citing AR at 594).

The ALJ also referred to treatment notes from Erika Benson, NP ("Nurse Practitioner Benson"), as well as an evaluation from Dr. Thomas Thomason, an otolaryngologist. AR at 21. Nurse Practitioner Benson conducted a physical examination of Plaintiff in April 2018, observing that Plaintiff had a normal gait and was able to get out of a chair and up and down from the examination table without assistance. AR at 21 (citing AR at 598). Dr. Thomason evaluated Plaintiff in August 2018, describing Plaintiff's Meniere's disease as "under control" and reporting that Plaintiff had experienced only four episodes of dizziness since her eye surgery nearly eight months

14

earlier. AR at 21 (citing AR at 748). The ALJ emphasized that Dr. Thomason did not specify any deficits related to Plaintiff's balance, coordination, or ability to ambulate. AR at 21 (citing AR at 748-750). The ALJ found the treatment notes and findings of Nurse Practitioner Benson and Dr. Thomason consistent with the findings of Dr. Young-Rodriguez. *See* AR at 21-22. And, ultimately, the ALJ concluded that Plaintiff was "not able to perform work that requires balance." AR at 20. Also relevant to Plaintiff's balance problems, the ALJ found that Plaintiff "must avoid exposure to hazardous conditions such as unprotected heights and dangerous moving machinery." AR at 20. Plaintiff maintains that these limitations are vague and insufficient. *Doc. 26* at 13. She insists that the ALJ should have elaborated on "work that requires balance" in the RFC, providing more detailed limitations to account for her significant problems with balance. *Id*. at 14.

At first blush, the ALJ's limitation to jobs that do not require *any* balance appears to be far more restrictive than the balance limitation found by Dr. Young-Rodriguez to jobs not requiring "excellent balance."  But according to DOT's companion publication *Selected Characteristics of Occupations Defined in the Revised Dictionary of Occupational Titles* ("SCO"), "balancing" is defined as "[m]aintaining body equilibrium to prevent falling when walking, standing, crouching, or running *on narrow, slippery, or erratically moving surfaces* or maintaining body equilibrium when performing gymnastic feats." SCO, App. C(3) (U.S. Dep't. of Labor 1993) (emphasis added). Applying this definition, the ability to balance is not implicated when standing or walking on *regular* services. As such, a limitation to jobs not requiring balance, is basically a limitation to

jobs not requiring that ability to traverse narrow, slippery, or erratically-moving surfaces. *See id*.

Plaintiff does not specify the additional detail she would have the ALJ include in the RFC analysis to account for her balance impairment, and the only legal authority she offers in support of her position on this issue is SSR 85-15. SSR 85-15 provides that limitations in the ability to balance "can have varying effects on the occupational base, depending on the degree of limitation and the type of job." *Doc. 26* at 13 (quoting SSR 85-15, 1985 WL 56857, *6 (Jan. 1, 1985)). SSR 85-15 also explains that "[w]here a person has some limitation on climbing and balancing and it is the only limitation, it would not ordinarily have significant impact on the broad world of work." SSR 85-15, 1985 WL 56857, *6. The Ruling advises that where the effects of a balancing limitation on the occupational base are difficult to determine, the services of a vocational specialist may be necessary.  *Id*.

Here, the ALJ *did* employ the help of a VE in determining which jobs were available to Plaintiff given her RFC. Specifically, the ALJ asked the VE whether a hypothetical person who "should not be required to balance" and who had additional specified limitations could perform jobs in the national economy. AR at 66. The VE identified three available jobs and testified that she was aware that her testimony was required to be consistent with the DOT *and its companion publications*. AR at 65-66. After assuring the ALJ that she would identify any variations between her testimony and those publications, the ALJ did not point out any such variations. *See* AR at 65-66. Thus, it would have been reasonable for the ALJ to assume that the VE was testifying in accordance with the definition of "balancing" supplied by the SCO. Notably, Plaintiff

16

does not contend that any of the three jobs identified by the VE requires balancing of the sort contemplated by the SCO.

Although the ALJ could have been more specific about Plaintiff's limitations in the area of balancing, and she could have clarified that she and the VE were both relying upon the definition of "balancing" supplied by the SCO, the Court does not find reversible error here. To the extent Plaintiff contends that her balancing problems are more significant than the inability to maneuver on a slippery surface or perform gymnastic feats (*Doc. 26* at 14), the Court finds substantial evidence to support the ALJ's implicit finding that Plaintiff is not limited when standing or walking on *regular* surfaces so long as she is not confronted with hazardous conditions such as unprotected heights or dangerous moving machinery. Indeed, the VE's testimony constitutes substantial evidence in support of the ALJ's finding. The Court will not reverse on this ground.

### C.  Whether the ALJ erred in assessing Plaintiff's ability to bend.

Each of the three jobs identified by the VE  as available to Plaintiff require medium exertion. *See* DOT No. 323.687-010, *Cleaner, hospital*, 1991 WL 672782 (Jan. 1, 2016); DOT No. 319.687-010, *Counter-supply worker*, 1991 WL 672772; DOT No. 311.677-018 (Jan. 1, 2016), *Dining room attendant*, 1991 WL 672696 (Jan. 1, 2016). Plaintiff notes that with most medium jobs two types of bending must be performed frequently (i.e. from one-third to two-thirds of the time). *Doc. 26* at 14. Claimants must be able to stoop (i.e. bend downward and forward by bending the spine at the waist) and crouch (i.e. bend downward and forward by bending both the legs and the spine). *Id*.

Here, Plaintiff reported that she was unable to bend down because she suffered from dizziness. *See, e.g.*, AR at 55 (testifying that bending over "too long" increases dizziness), 286-87 (indicating that she had difficulty bending and squatting and that she "can't bend down + up [due to] effects [from] Meniere's Disease"). Dr. Young-Rodriguez also offered findings related to Plaintiff's ability to bend, and the ALJ noted, for example, Dr. Young-Rodriguez's notations that Plaintiff could squat, though she complained of dizziness, and that she needed to regain her balance and brace herself at times when changing activities. AR at 22 (citing AR at 595). Dr. Young-Rodriguez's report also specified that Plaintiff was "able to flex her lumbar spine 90 degrees holding onto furniture because of dizziness." AR at 595.

Although the ALJ discussed Plaintiff's subjective complaints that her dizziness worsened with bending (*see, e.g.*, AR at 21, 22) and Dr. Young-Rodriguez's findings (*see* AR at 22), she did not include an RFC limitation specifically related to bending (*see* AR at 20). Plaintiff insists that her failure to do so constitutes reversible error. *Doc. 26* at 14. Given her diagnosis of Meniere's disease, Plaintiff insists that she demonstrated a "loose nexus" between her impairment and her difficulty bending. *Id.* at 14-15 (citing *Kepler v. Chater*, 68 F.3d 387, 390 (10th Cir. 1995)).

The Court is satisfied that the ALJ offered well-supported reasons for concluding that Plaintiff's reported symptoms, including difficulty bending, were not as debilitating as Plaintiff claimed. In so finding, the ALJ noted providers' observations that Plaintiff was able to get out of a chair and up and down from an examination table without assistance. AR at 21. She recognized that Plaintiff did not have difficulty dressing or undressing. AR at 22 (citing AR at 595). She also highlighted Dr. Thomason's August

2018 findings that Plaintiff's Meniere's disease was "under control" and that Plaintiff had experienced only four episodes of dizziness in a nearly eight-month period. AR at 21-23 (citing AR at 749). Together these observations by the ALJ provide a reasonable basis for her determination that Plaintiff's reported bending limitations were inconsistent with other evidence of record. This is especially true where no medical source found Plaintiff limited in her ability to bend. To the contrary, Dr. Young-Rodriguez opined that Plaintiff was limited in balancing but not bending, and Drs. Clifford and Billinghurst found no limitations in Plaintiff's ability to stoop, kneel, or crouch. AR at 78, 112, 596.

The ALJ summarized her findings regarding Plaintiff's exertional limitations, explaining that "[b]ased on [Plaintiff's] examination results that show she had no deficits in her strength or ability to move about, I find that she is able to perform work at all exertional levels but she must not have a requirement to balance." AR at 24. The ALJ's evaluation of Plaintiff's ability to bend and her omission of any limitation in this area is supported by substantial evidence in the record. Accordingly, the Court will not reverse on this ground.

### D. Whether the ALJ erred in evaluating Dr. Krueger's opinion.

Plaintiff contends that the ALJ erred in rejecting the opinions of consulting examiner Dr. Krueger. *See Doc. 26* at 15-19. The Commissioner counters, maintaining that the ALJ offered legitimate reasons for rejecting Dr. Krueger's opinions. *Doc. 30* at 15-18.

The ALJ discussed the June 2019 psychological evaluation performed by Dr. Krueger. AR at 22-23. She also reviewed complaints that Plaintiff expressed to Dr. Krueger, including that she had Meniere's disease with associated vertigo, struggled

19

with vision impairments, and experienced emotional difficulty and depression. AR at 22. The ALJ noted Dr. Krueger's finding that Plaintiff had blunted affect and appeared to be depressed. AR at 22. She also recognized that Dr. Krueger administered cognitive tests and that the Wide Range Achievement Test-Revised ("WRAT-R") revealed difficulty with word recognition and a fifth-grade reading level, while the Wechsler Adult Intelligence Scale-IV ("WAIS-IV") showed impaired concentration, memory, and verbal comprehension. AR at 22. The ALJ acknowledged that Dr. Krueger found Plaintiff functionally impaired, including in following instructions, maintaining persistence and pace, and interacting with others. AR at 22-23 (citing AR at 738-44). However, the ALJ rejected these limitations, describing them as "not persuasive." AR at 23. The ALJ offered the following explanation for this finding:

> Although his opinion is generally consistent with his examination results that show cognitive deficits and learning disorder related to [Plaintiff's] ability to read, her treatment notes fail to support any severe mental impairments. Although a history of depression was noted, there was no evidence of treatment by a mental health professional and examinations were unremarkable. Additionally, an internal medicine consultative examiner noted there was no evidence of mental abnormality.

AR at 23 (internal citations omitted). In support of his rejection of Dr. Krueger's opinions, the ALJ referenced three sets of medical records. First, she cited treatment notes from an April 2018 "routine physical" with Nurse Practitioner Benson, indicating that Plaintiff was "alert and oriented" and that a "cognitive exam was grossly normal." AR at 23 (citing AR at 598). At that visit, Plaintiff also denied anxiety and depressed mood. AR at 599. Second, the ALJ cited treatment notes from Plaintiff's September 2017 visit to Presbyterian Espanola Hospital for abdominal pain. AR at 23 (citing AR at 708-09). At that visit, Plaintiff reported a past history of depression and indicated that she had been

prescribed Valium. AR at 709. This September 2017 physical examination conducted by Jessica Lynn Alcon-Romero, CNP showed Plaintiff to be "alert and oriented" and to have "normal mood and affect." AR at 710. Finally, the ALJ relied upon the report of Dr. Young-Rodriguez, M.D., referenced above.  AR at 23 (citing AR at 595). With respect to Plaintiff's mental impairments, Dr. Young-Rodriguez found that "[t]here was no evidence of mental abnormality" and that Plaintiff was calm, followed directions well, and had full affect. AR at 595-96.

Similar to the findings of the other medical providers cited by the ALJ, Dr. Krueger found Plaintiff "well oriented and cooperative." AR at 741. But Dr. Krueger also observed that Plaintiff "presented as being depressed" with somewhat blunted emotional expression. AR at 741. Dr. Krueger found "no clear evidence of a psychosis[,]" and he remarked that Plaintiff's communication skills were "clear and . . . of average rate." AR at 741.

Dr. Krueger's opinions are unique in the area of cognitive functioning, which he found significantly impaired. AR at 743. Specifically, Dr. Krueger found Plaintiff to have "seriously impaired verbal comprehension skills" as well as "significant impairment with concentration and memory." AR at 743. In terms of functional impairments, he opined that Plaintiff was moderately impaired in her ability to understand and remember complex or detailed instructions; markedly impaired in maintaining pace and persistence; markedly impaired in adjusting to changes in work environment; and moderately impaired in her relationships with coworkers, supervisors, and in dealing with the general public. AR at 743-44. The ALJ does not incorporate any of these limitations into Plaintiff's RFC. *See* AR at 20.

Plaintiff insists that the ALJ's stated reasons for rejecting Dr. Krueger's opinions – the absence of evidence of mental health treatment, unremarkable examinations, and the opinion of a Dr. Rodriguez-Young that there is "no evidence of mental abnormality – are "contrary to law." *Doc. 26* at 17. First, she suggests that Plaintiff's failure to seek treatment for her mental impairments was irrelevant. *Id.* at 17-18. She cites three Tenth Circuit cases for the proposition that "consideration of the amount of treatment received by a claimant does not play a role in" determining the severity of a mental impairment. *Id.* (citing *Grotendorst v. Astrue*, 370 F. App'x 879, 883 (10th Cir. 2010), *Fleetwood v. Barnhard*, 211 F. App'x 736, 739 (10th Cir. 2007), and *Carpenter v. Astrue*, 537 F.3d 1264, 1266 (10th Cir. 2008)). The Commissioner points out, however, that the cases Plaintiff cites address an ALJ's step-two finding that a claimant's mental impairment was non-severe on the basis that the claimant failed to seek treatment for it.  *Doc. 30* at 16. The cases do not directly speak to the issue before the Court – that is, the ALJ's evaluation of Dr. Krueger's mental limitation findings. To the extent that the absence of records documenting mental health treatment undercut Plaintiff's complaints of depression and emotional difficulties, the Court concludes that the ALJ's analysis is not unreasonable or contrary to law.

Second, Plaintiff submits that "there is no indication in any medical records that the doctors, mostly eye doctors, ever tested [Plaintiff] for anything other than vision and neurological problems." *Doc. 26* at 18. Plaintiff emphasizes that although Dr. Young-Rodriguez found "no evidence of mental abnormality," there is no indication that he was asked to evaluate Plaintiff's mental limitations, an inquiry that she submits would have been outside of his expertise. *Id.* at 18. Plaintiff, in essence, submits that the opinions of

Dr. Krueger are uncontroverted, given that the other medical providers were not tasked with evaluating her cognitive limitations. Plaintiff further suggests that the ALJ's rejection of Dr. Krueger's cognitive limitation findings, despite his administration of generally accepted cognitive testing, "is a stark example of why the law does not allow an ALJ to substitute her lay opinion for that of a medical expert." *Id.* at 19 (citing *Lax v. Astrue*, 489 F.3d 1080, 1089 (10th Cir. 2007)). On this point, the Court agrees.

The Commissioner contends that Plaintiff's arguments are "unavailing," because the medical providers who treated her "recorded normal mental status findings throughout the relevant period." *Doc. 30* at 17 (citing AR at 556, 559, 562, 598, 680, 683, 686, 689-90, 693, 697, 708-710). The Commissioner concedes that the providers who offered these normal mental status findings were treating Plaintiff for conditions other than her mental health. *Id.* at 17. Nevertheless, the Commissioner insists that the findings constitute substantial evidence for the ALJ's rejection of Dr. Krueger's mental limitations. *Id*. To the extent that Plaintiff argues that the ALJ improperly rejected functional limitations attributed to her major depressive disorder, the Court concludes that the consistently normal findings as to Plaintiff's mood and affect, together with the absence of mental health treatment records, provide legitimate reasons for rejecting such limitations.

Critically, however, Dr. Krueger did not attribute Plaintiff's cognitive impairments to her major depressive disorder. *See* AR at 742-44. Rather, he suggested that Plaintiff's reading disorder and other learning disorders were the source of her cognitive impairments. *See id*. For her part, the ALJ identified Plaintiff's reading disorder as a medically-determinable impairment, albeit non-severe, and remarked that Dr. Krueger's

opinions were "generally consistent with his examination results that show cognitive deficits and learning disorder related to [Plaintiff's] ability to read." AR at 18, 23. Yet, despite finding Dr. Krueger's findings internally consistent, the ALJ considered them at odds with the mental status findings of other medical sources. But in the Court's view, observations of "normal mood and affect," pleasantness, alertness, and cooperation do not necessarily bear upon cognitive limitations attributed to Plaintiff's learning disabilities.[4]  It was improper for the ALJ to reject Dr. Krueger's cognitive limitation findings in favor of irrelevant normal mental status findings, and the ALJ does not otherwise explain how Dr. Krueger's findings were controverted by evidence of record. Nor were the functional limitations found by Dr. Krueger the types of problems a claimant would address with counseling. The Court considers the absence of mental health records to be an unreasonable basis for discounting Dr. Krueger's cognitive limitations. The Court agrees with Plaintiff that the ALJ erred in evaluating and rejecting Dr. Krueger's opinions on the basis of purported inconsistencies in the record.

The ALJ has the burden at Step Five of the sequential evaluation to demonstrate that Plaintiff retains an RFC sufficient to perform other jobs existing in significant numbers in the national or regional economy. *Grogan v. Barnhart*, 399 F.3d 1257, 1261 (10th Cir. 2005). In order for the VE's testimony to constitute substantial evidence supporting the denial of benefits, the information provided to the witness must

---

[4] One potential exception is Nurse Practitioner Benson's observation that Plaintiff demonstrated "grossly normal cognitive abilities." *See* AR at 598. This isolated observation, however, was not the finding of a psychological examiner conducting a cognitive evaluation but the unspecific note of a nurse practitioner performing a general physical and evaluating Plaintiff's concerns about an abnormal menstrual cycle. *See* AR at 598. Given its vagueness and the ALJ's failure to discuss the note, this fleeting remark alone fails to provide a legitimate reason for rejecting the cognitive limitations found by Dr. Krueger.

accurately reflect all of the claimant's impairments. *Hargis v. Sullivan*, 945 F.2d 1482, 1492 (10th Cir. 1991). Here, the ALJ omitted limitations related to Plaintiff's cognitive impairments in the RFC. As such, her error in evaluating Dr. Krueger's opinions was harmful and requires remand.

Wherefore,

**IT IS ORDERED** that Plaintiff's Motion to Reverse and Remand for Rehearing with Supporting Memorandum (*Doc. 26*) is **GRANTED**.

_____
UNITED STATES MAGISTRATE JUDGE
Presiding by Consent